Approved: _____
Cecilia E. Vogel
Assistant United States Attorney

Before: THE HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York

**23 MAG 2895**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NERIK ILYAYEV, and<br>MUKHIDDIN KADIROV,<br><br>Defendants. | SEALED COMPLAINT<br><br>Violations of 18 U.S.C. §§ 1028A, 1344, 1347, 1956, and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

ALI D. AMHAZ-STRICKLAND, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Healthcare Fraud)

1. From at least in or about December 2020 through at least in or about October 2022, in the Southern District of New York and elsewhere, NERIK ILYAYEV, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a healthcare benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of a payment for healthcare benefits, items, and services in violation of Title 18, United States Code, Section 1347, to wit ILYAYEV, the defendant, owned and operated a pharmacy in Manhattan ("Pharmacy-1") using the identity of another person and submitted fraudulent claims to Medicare and Medicaid for HIV medications using Pharmacy-1.

(Title 18, United States Code, Sections 1347 and 2.)

### COUNT TWO
### (Conspiracy to Commit Money Laundering)

2. From at least in or about December 2020 through at least in or about October 2022, in the Southern District of New York and elsewhere, NERIK ILYAYEV and MUKHIDDIN KADIROV, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

3.      It was a part and an object of the conspiracy that NERIK ILYAYEV and MUKHIDDIN KADIROV, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, healthcare fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h).)

**COUNT THREE**
**(Bank Fraud)**

4.      From at least in or about December 2020 through at least in or about October 2022, in the Southern District of New York and elsewhere, NERIK ILYAYEV, the defendant, knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, ILYAYEV used the identity of another person to open and use a bank account at a federally-insured financial institution in order to receive and launder healthcare fraud proceeds from Pharmacy-1.

(Title 18, United States Code, Sections 1344 and 2.)

**COUNT FOUR**
**(Bank Fraud)**

5.      From at least in or about December 2020 through at least in or about October 2022, in the Southern District of New York and elsewhere, MUKHIDDIN KADIROV, the defendant, knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, KADIROV used the identity of another person to open and use at least three bank accounts at federally-insured financial institutions in order to receive and launder healthcare fraud proceeds from Pharmacy-1.

(Title 18, United States Code, Sections 1344 and 2.)

**COUNT FIVE**
**(Aggravated Identity Theft)**

6.  From at least in or about December 2020 through at least in or about October 2022, in the Southern District of New York and elsewhere, NERIK ILYAYEV, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, ILYAYEV transferred, possessed, and used the name and other means of identification of another person during and in relation to the healthcare fraud and the bank fraud violations charged in Counts One and Three of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

**COUNT SIX**
**(Aggravated Identity Theft)**

7.  From at least in or about December 2020 through at least in or about October 2022, in the Southern District of New York and elsewhere, MUKHIDDIN KADIROV, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, KADIROV transferred, possessed, and used the name and other means of identification of another person during and in relation to the bank fraud violation charged in Count Four of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.  I am a Special Agent with FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, and my review of bank records, websites, and law enforcement databases. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview

9.  Since in or about January 2022, the FBI has been investigating a healthcare fraud and money laundering scheme involving Pharmacy-1, a pharmacy located in upper Manhattan, as well as other pharmacies. Pharmacy-1 opened in or about February 2021 and closed in or about March 2022. As described further below, NERIK ILYAYEV, the defendant, owned and controlled Pharmacy-1 using the identity of another person ("Individual-1"). ILYAYEV then used Pharmacy-1 to submit fraudulent insurance claims to Medicare and Medicaid for HIV medications. ILYAYEV caused Pharmacy-1 to pay illegal kickbacks to HIV patients to recruit them to fill prescriptions for HIV medications at Pharmacy-1. ILYAYEV used a bank account at an FDIC-

3

insured bank in the name of Individual-1 to receive the fraudulent Medicare and Medicaid insurance payments. ILYAYEV subsequently laundered the proceeds of the healthcare fraud by depositing checks into the bank accounts of three shell companies that were purportedly wholesale companies (the "Shell Companies") and were controlled by MUKHIDDIN KADIROV, the defendant. KADIROV used the identity of another person ("Individual-2") to control the bank accounts for the Shell Companies, which were at FDIC-insured banks. As described further below, Pharmacy-1 obtained approximately $5.2 million in fraudulent Medicare and Medicaid insurance payments, and Pharmacy-1 laundered approximately $4.2 million through the Shell Companies.

<u>The Pharmacy Fraud: ILYAYEV Used Another Person's Identity to Own Pharmacy-1</u>

10. Based on my review of bank and incorporation records, I have learned that Pharmacy-1 was incorporated on or about December 1, 2020, and Pharmacy-1's bank account was opened on or about January 19, 2021. Based on my review of records from the New York State Board of Pharmacy, I have learned that the pharmacy business that became Pharmacy-1 was sold, purportedly to Individual-1, in or about February 2021, and that Pharmacy-1 closed in or about March 2022.

11. Travel records, however, show that Individual-1, a foreign national, left the United States in or about October 2018 and has not returned to the United States since. Accordingly, Individual-1 was not in the United States at the time Pharmacy-1 was incorporated, its bank account opened, or its pharmacy business purchased, and Individual-1 was never in the United States while Pharmacy-1 was operational.

12. The FBI has interviewed the person who owned Pharmacy-1 prior to its sale in February 2021, when Pharmacy-1 operated under a different name (the "Prior Owner"). The Prior Owner stated the following, in substance and in part:

    a. The Prior Owner sold the pharmacy that became Pharmacy-1 to a person using the name of Individual-1.

    b. The Prior Owner, however, did not recognize a photograph of Individual-1, and the Prior Owner stated the person depicted in the photograph was not the person to whom he had sold Pharmacy-1.

    c. The Prior Owner reviewed a recent photograph of NERIK ILYAYEV, the defendant, taken by the FBI during surveillance, and the Prior Owner identified the person in the photograph, *i.e.*, ILYAYEV, as the person who in fact purchased Pharmacy-1 from the Prior Owner and whom the Prior Owner knew by the name of Individual-1.

13. Similarly, the FBI interviewed a pharmacist who had worked for the Prior Owner and for a time purportedly for Individual-1 at Pharmacy-1 ("Pharmacist-1"). Pharmacist-1 stated the following, in substance and in part:

    a. Pharmacist-1 recognized the name of Individual-1 as the owner of Pharmacy-1 starting in 2021, but Pharmacist-1 did not recognize a photograph of Individual-1.

4

b.      Pharmacist-1 described the person he believed to be Individual-1 as a Russian-speaking male under the age of 40. Pharmacist-1 also recalled that he had heard another person refer to the person he believed to be Individual-1 as "Eric."

c.      Pharmacist-1 provided a phone number ending in "-9637" as the contact phone number for the person Pharmacist-1 knew as Individual-1 (the "9637 Phone").[1]

d.      Pharmacist-1 reviewed a recent photograph of NERIK ILYAYEV, the defendant, taken by the FBI during surveillance, and Pharmacist-1 identified the person in the photograph, *i.e.*, ILYAYEV, as the owner of Pharmacy-1 for whom Pharmacist-1 worked after working for the Prior Owner and whom Pharmacist-1 knew by the name of Individual-1.

14.     Based on my review of Individual-1's driver's license information, I have learned that Individual-1 is approximately sixty-four years old and thus does not match the description of Individual-1 provided by Pharmacist-1.

15.     On or about April 7, 2022, and April 11, 2022, I and other law enforcement officers conducted surveillance with the aid of the cell-site simulator obtained pursuant to a judicially-authorized warrant to determine the precise location of the 9637 Phone. Based on this surveillance, we learned the following, among other things:

a.      The 9637 Phone was determined to be located in an empty or closed office space in Queens, New York that was previously used as a law office (the "Empty Office Space"). There were no business activities apparently taking place in the Empty Office Space during normal business hours, and any business signage had been painted over or removed.

b.      On or about April 11, 2022, at approximately 10:52 a.m., I and other law enforcement agents observed a black BMW sedan (the "BMW") parked in front of the Empty Office Space. I and other law enforcement agents observed a man exiting the front door of the Empty Office Space and entering the driver's seat of the BMW carrying a cellphone.

c.      Within approximately one minute of the man exiting the Empty Office Space and entering the BMW, pen register data obtained pursuant to a Court order showed that the 9637 Phone began sending text messages. Based on my training and experience, I believe that this indicates that the man who entered the BMW had retrieved the 9637 Phone from the Empty Office Space.

d.      By later comparing the man I observed in the BMW to known photographs of NERIK ILYAYEV, the defendant, and later observing ILYAYEV in person during surveillance, I have identified the man in the BMW as ILYAYEV.

16.     I have reviewed registration records for the BMW maintained by the New York Department of Motor Vehicles, and I have learned that the BMW is registered in the name of a pharmacy located in the Bronx, New York. I have reviewed records for that pharmacy maintained

---

[1] No subscriber information is available for the 9637 Phone according to the service provider.

by the U.S. Centers for Medicare and Medicaid Services ("CMS"), and I have learned that the pharmacy is owned by NERIK ILYAYEV, the defendant.

17.     Based on my review of New York property records, I have learned that NERIK ILYAYEV, the defendant, is the owner of a residence located in Flushing, New York. Law enforcement conducted surveillance at that location on or about April 12, 2022, and observed the BMW driving in the vicinity of that location.

18.     Based on my review of databases available to law enforcement, I have learned that NERIK ILYAYEV, the defendant, is an approximately thirty-five-year-old male who was born in Uzbekistan or Russia and who has United States and Russian citizenship. I have also reviewed a New York City Police Department report describing an encounter with ILYAYEV, in which ILYAYEV identified himself as "Eric Ilyayev".

19.     Based on the information described above, I submit there is probable cause to believe that NERIK ILYAYEV, the defendant, is the person who purchased Pharmacy-1 in or about February 2021 using the name of Individual-1. Based on my training and experience, I believe the owner of Pharmacy-1, *i.e.*, ILYAYEV, used Individual-1's identity to conceal his own identity and connection to the insurance billing fraud described below.

### The Pharmacy Fraud: Fraudulent Insurance Billing

20.     In addition to the information described above, Pharmacist-1 made the following statements, in substance and in part, in interviews with the FBI:

    a.     While Pharmacist-1 worked at Pharmacy-1 for the person Pharmacist-1 believed to be Individual-1, *i.e.*, NERIK ILYAYEV, the defendant, patients who were filling HIV medications at Pharmacy-1 demanded payment from Pharmacist-1 at times, asking Pharmacist-1, "where is my pay?" and "where is my bonus?" Pharmacist-1 was surprised by these inquiries from the patients.

    b.     At the time Individual-1, *i.e.* ILYAYEV, took over Pharmacy-1, Pharmacist-1 noticed an unusual influx of HIV patients from the Bronx, even though Pharmacy-1 was located in Manhattan. Under the Prior Owner, Pharmacy-1 had few HIV patients.

    c.     Individual-1, *i.e.*, ILYAYEV, brought his own delivery drivers to Pharmacy-1. Pharmacist-1 observed that delivery men who worked for Pharmacy-1 appeared to each have their own set of patients that the delivery men brought to Pharmacy-1 to fill HIV medication prescriptions, and the drivers delivered HIV medications to the patients. Pharmacist-1 believed the delivery men were paying the patients, who typically did not reside in the vicinity of Pharmacy-1, to fill HIV medication prescriptions at Pharmacy-1.

    d.     Pharmacist-1 provided text messages with the person he believed to be Individual-1, *i.e.,* ILYAYEV, using the 9637 Phone. Based on my review of those text messages, I have learned that the purported Individual-1, *i.e.*, ILYAYEV, gave instructions to Pharmacist-1 regarding the operation of Pharmacy-1, including the distribution of HIV medications and the coordination of delivery drivers. Pharmacist-1 relayed in text messages to Individual-1, *i.e.*,

ILYAYEV, that patients were complaining that there was no money in their prescription bag. Pharmacist-1 ultimately stopped working for Pharmacy-1, in part, because Pharmacist-1 was concerned that the patients were being paid incentives by Pharmacy-1 to fill prescriptions for HIV medications at Pharmacy-1.

21. Based on Medicare and Medicaid insurance claims for Pharmacy-1, I have learned that a patient ("Patient-1") received HIV medications during the time ILYAYEV owned Pharmacy-1. Based on my review of a report summarizing an FBI interview of a patient Patient-1, I have learned the following in substance and in part:

    a.    For a time, Patient-1 filled his HIV medication prescriptions at Pharmacy-1.

    b.    For approximately the past five years, Patient-1 has used a particular delivery driver ("Driver-1") to receive his prescriptions, and Patient-1 has filled his prescriptions at specific pharmacies as directed by Driver-1.

    c.    Driver-1 paid Patient-1 to fill his prescriptions at the specific pharmacies, including Pharmacy-1. Initially Driver-1 paid Patient-1 $100 per month and later increased the payment to $150 and then $200. Driver-1 purchased unopened bottles of HIV medication back from Patient-1 for $200 per bottle.

22. Based on my review of Medicare and Medicaid billing data for Pharmacy-1 for the period from approximately January 2020 through April 2022, as well as my training and experience, I have learned that Pharmacy-1 filled a disproportionately high volume of prescriptions for multiple expensive HIV medications starting in our about February 2021, shortly after ILYAYEV purchased Pharmacy-1 using the identity of Individual-1, until in or about March 2022, at which point Pharmacy-1 stopped operating.

23. The Investigations Medicare Drug Integrity Contractor ("I-MEDIC") conducted an invoice reconciliation for Pharmacy-1 for the period from in or about February 2021 to in or about February 2022, which entails comparing Medicare and Medicaid claims submitted by Pharmacy-1 for medications dispensed to beneficiaries, *i.e.*, patients, with invoice data reflecting medications purchased by Pharmacy-1 from licensed drug wholesalers. I-MEDIC's invoice reconciliation revealed significant drug shortages during this period, meaning Pharmacy-1 claimed to Medicare and Medicaid that it distributed more drugs to beneficiaries than Pharmacy-1 had purchased from licensed wholesalers. Specifically, the top ten drugs identified with shortages by dollar loss during this period were HIV medications, and I-MEDIC found an approximate dollar loss of $5.2 million to Medicare and Medicaid due to these shortages.

24. I-MEDIC's analysis concluded that consistently large losses for medications in similar drug categories are not typical and may be indicative of fraudulent activity. Based on my training and experience, I have learned that high-cost HIV medications are frequently used in fraudulent insurance billing schemes. Such schemes can include paying delivery drivers to recruit patients to fill HIV prescriptions at a particular pharmacy in order to increase the pharmacy's insurance billing, which is against the law, or obtaining HIV medications from unauthorized

sources, such as buying back medications from patients in order to resell them, and then fraudulently billing insurance for the medications obtained from unauthorized sources.

*Overview of the Money Laundering Network*

25. Since in or about 2020, I and other law enforcement agents at the FBI have been investigating a money laundering network that primarily launders healthcare fraud proceeds (the "Money Laundering Network"). Based on the information described below, I believe that certain members of the Money Laundering Network participated in laundering the insurance fraud proceeds of Pharmacy-1.

26. Based on my participation in this investigation, I learned that members of the Money Laundering Network typically deposit checks from healthcare companies that represent healthcare fraud proceeds into New York-based bank accounts held by shell companies. The shell companies often purport to be wholesale companies and use terms like "wholesale" in the company name to make the check deposits from the healthcare companies appear less suspicious to banks and law enforcement. The individuals controlling the shell companies collect cash typically from U.S.-based individuals who want to remit funds, typically to Uzbekistan, through unlicensed channels. The individuals controlling the shell companies provide that cash, minus a fee, to the individuals providing the healthcare checks. The individuals controlling the shell companies typically wire the check deposit proceeds from the shell companies to Chinese or other foreign companies to purchase goods from those foreign companies. The foreign companies ship the goods to importers in Uzbekistan. The importers pay the Uzbekistan-based partners of the individuals operating the shell companies in U.S. Currency for the goods. Those Uzbekistan-based partners would then give the U.S. currency to the families and friends of the individuals who had provided the cash to the individuals controlling the shell companies in New York.

27. During the investigation, the FBI arrested an individual who later became a confidential source ("CW-1").[2] Prior to CW-1's arrest, CW-1 operated an unlicensed money transmitting business and participated in the Money Laundering Network. In addition, during this same investigation, the FBI arrested an individual who later became a cooperating witness ("CW-2").[3] Based on evidence gathered during the investigation and information provided CW-1 and

---

[2] CW-1 has pled guilty pursuant to a cooperation agreement to conspiracy to operate an unlicensed money transmitting business, conspiracy to commit money laundering, and conspiracy to commit bank fraud. CW-1 is cooperating with law enforcement in the hope of obtaining leniency at sentencing. To date, information received from CW-1 has proven reliable and has at times been corroborated by independent sources of evidence.

[3] CW-2 has pled guilty pursuant to a cooperation agreement to conspiracy to commit bank fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, operation of an unlicensed money transmitting business, and aggravated identity theft. CW-2 is cooperating with law enforcement in the hope of obtaining leniency at sentencing. To date, information received from CW-2 has proven reliable and has at times been corroborated by independent sources of evidence.

CW-2, I learned that prior to CW-2's arrest, CW-2 participated in the Money Laundering Network with CW-1 and others. CW-1 and CW-2 laundered healthcare fraud proceeds by working with others to accept checks from healthcare companies, in exchange for the checks providing cash collected from New York-based individuals wishing to send remittances, coordinating the deposit of those checks into various shell companies, facilitating transfers from the shell companies to Chinese and other foreign companies, and partnering with individuals in Uzbekistan to deliver U.S. currency to the remittance recipients.

*Laundering of Pharmacy-1's Fraud Proceeds*

28. Based on information provided by CW-1, on or about January 30, 2022, a co-conspirator in the Money Laundering Network ("CC-1") provided CW-1 with three checks totaling $200,000 from Pharmacy-1. CW-1, who was cooperating at the time, provided the checks to the FBI. According to CW-1 and based on conversations recorded by CW-1 with CC-1 at the direction of the FBI, CC-1 knew CW-1 prior to CW-1's cooperation with law enforcement. In addition, prior to cooperating with law enforcement, CW-1 and CW-2 participated in the Money Laundering Network with CC-1's brother ("CC-2"), who controlled shell companies used by the Money Laundering Network and collected checks from pharmacies and other medical companies.

29. Based on my review of the Pharmacy-1 checks CC-1 provided to CW-1, the recipient line on the Pharmacy-1 checks were blank. CC-1 was not an employee of Pharmacy-1. Based on information provided by CW-1 and my review of recorded and written phone messages between CW-1 and CC-1, I have learned that CC-1 asked CW-1 to deposit the Pharmacy-1 checks and remit the funds abroad. CC-1 provided CW-1 with foreign bank account information to wire the funds to a company in China, a company in Latvia, and a company in Bangladesh. Under the supervision of the FBI, CW-1 accepted the checks from CC-1, but CW-1 did not wire the funds abroad. Based on information provided by CW-1, another confidential source, a victim, video surveillance, and recorded conversations, I learned that on or about February 8, 2022, CC-1 assaulted a victim with a baseball bat because he believed the victim was holding the $200,000 and delaying sending the funds abroad. The FBI arrested CC-1 in connection with this investigation, and he has been convicted of Hobbs Act extortion.

30. Based on my review of bank records for Pharmacy-1, I have learned that on or about January 31 and February 1, 2022, five checks from Pharmacy-1 totaling approximately $200,000 were deposited into the bank account of a purported transportation company owned by CC-2.

31. Based on my review of bank records for Pharmacy-1 from in or about January 19, 2021 through in or about October 25, 2022, I have learned that, in addition to providing checks to CC-1 and the company owned by CC-2, Pharmacy-1 deposited approximately $4.2M in checks with the three Shell Companies, which represents approximately 56% of the funds that flowed through Pharmacy-1's bank account during that period.[4]

---

[4] Although Pharmacy-1 stopped operating in or about March 2022, Pharmacy-1 continued to receive payments from Medicare and Medicaid until in or about April 2022 and continued to make disbursements until in or about October 2022.

9

32.	The Shell Companies' names include either "Wholesale" or "Supply." Based on my review of a list of known, licensed drug wholesalers provided by I-MEDIC, I have learned that the Shell Companies are not on that list of licensed drug wholesalers. Based on my review of open-source material, I have found no indication that the Shell Companies are drug wholesalers. In addition, based on my review of bank records for one of the Shell Companies to which Pharmacy-1 provided approximately $800,000 in checks, I have learned that the account signatory represented to the bank that the company engages in the following business: "buy interior store supplies; resale and install them." Based on my training and experience, it is unusual for an independent pharmacy like Pharmacy-1 to conduct this volume of business with wholesale companies that are not drug wholesalers.

33.	Moreover, I have reviewed bank records for the Shell Companies and observed banking activity consistent with the Money Laundering Network. The Shell Companies received significant deposits from other companies that appear to be medical companies, including pharmacies, and there is substantial overlap among the Shell Companies with respect to the companies depositing checks into the Shell Companies. One of the Shell Companies ("Shell Company-1") wired most of the funds that passed through it—which was several million dollars—to companies abroad, including China, Ukraine, and Russia, consistent with the operations of the Money Laundering Network. Several of the wire transfers sent abroad from Shell Company-1 passed through correspondent bank accounts in Manhattan, New York. The other two Shell Companies primarily transferred funds to Shell Company-1, but also sent several wires totaling approximately $241,000 to China and Ukraine, consistent with the operations of the Money Laundering Network.

*Identification of MUKHIDDIN KADIROV as the True Account Holder for the Shell Companies and Co-Conspirator of NERIK ILYAYEV*

34.	Based on my review of bank records, I have learned that a particular person ("Individual-2") is listed as the President of the Shell Companies and the signatory of the Shell Company bank accounts.

35.	Based on my review of travel and government record databases, I have learned that Individual-2 is a foreign national who resided in the United States at the time the Shell Company bank accounts were opened but left the United States in or about June 2021 and has not returned to the United States since.

36.	Nevertheless, bank records show that the Shell Company bank accounts were accessed by Internet Protocol ("IP") addresses in the United States after June 2021 and deposits were made in the New York City area. Bank video surveillance shows that, after June 2021, an individual (or individuals) on multiple occasions made deposits into one of the Shell Company bank accounts, but the individual wore what appeared to be black latex gloves, a gator pulled up to the eyes, and a hat, so that the face was not visible on the video.

37.	Based on physical surveillance and interviews conducted by law enforcement, I have learned that the address listed on the Shell Companies' bank records is a residence in Brooklyn that is not currently occupied by Individual-2.

10

38.     Based on my experience and involvement in the investigation, I have learned that, at times, members of the Money Laundering Network use the identities of other persons to open bank accounts for shell companies used to operate the Money Laundering Network.

39.     Based on my review of Shell Company-1 bank records and phone service provider records, I have learned that the Shell Company-1 bank account has paid for service for a cellphone ending in "-3523" (the "3523 Phone") through the end of October 2022.  These records also showed that service for the 3523 Phone for the current subscriber was activated on or about March 29, 2021, and remained active until at least October 2022. In addition, subscriber records show that the 3523 Cellphone is an Android Samsung Galaxy A32, and Shell Company-1 bank records show that an Android Samsung Galaxy A32 device was used on multiple occasions to access the Shell Company-1 bank account, starting at least as early as November 2021 and continuing until at least July 2022.

40.     Based on my review of toll records for the 3523 Phone, and bank records for the Shell Companies, I have learned the following, in substance and in part, among other things:

   a.     Between in or about April 4, 2021 and June 7, 2021 the 3523 Phone had approximately 29 calls with a phone number ending in "-7626" (the "7626 Phone"). The 7626 Phone is the listed phone number for Individual-2 on the Shell Company-1 Bank Account. As described above, travel records show Individual-2 was in the United States during this time but left the United States in or about June 2021.

   b.     Between in or about April 6, 2021 and January 11, 2022, the 3523 Phone was in contact multiple times with each of the three banks that maintained accounts for the Shell Companies.

41.     The listed subscriber of the 3523 Phone is "Mike Rter". I have searched law enforcement and public databases for "Mike Rter" and "Michael Rter", and there are no results in response to those queries, indicating those are not real identities. In addition, the subscriber email address is "mike@gmail.com", which based on my training and experience, is unlikely to be the subscriber's email address given that "mike" is a common name, Gmail has approximately over 1.5 billion active users worldwide, and there are no additional identifying letters or numbers in the email address.

42.     Based on my review of bank audio recordings of phone calls from in or about May 2021 from an individual using the 3523 Phone regarding one of the Shell Companies, I have learned that the caller using the 3523 Phone identified himself as Individual-2.

43.     Based on information provided by CW-2, I have learned the following, in sum and substance, among other things:

   a.     At the direction of the FBI, CW-2 listened to the audio recordings described in paragraph 42.  CW-2 identified the voice of the caller as the voice of MUKHIDDIN KADIROV, the defendant.

11

    b. According to CW-2, CW-2 met KADIROV in or about 2001 in New York City, and CW-2 and KADIROV later became roommates for a time. KADIROV currently operates a construction company, and CW-2 and KADIROV remain in contact. KADIROV has worked on construction projects for other co-conspirators ("CC-3" and "CC-4") who used the Money Laundering Network to launder the proceeds of healthcare fraud and have since pled guilty to conspiracy to launder healthcare fraud proceeds from New York City-area pharmacies they controlled.

    c. KADIROV previously introduced CW-2 to CC-3 as a potential investor in a restaurant project CW-2 wanted to start with his business partner, CC-2. Later, in or about 2019 and 2020, as part of CW-2's involvement in the Money Laundering Network and using shell companies, CW-2 began cashing checks from various healthcare companies that CW-2 received from CC-3. On several occasions, KADIROV brought pharmacy checks to CW-2 on behalf of CC-3 in order for CW-2 to cash them. Prior to cooperating with law enforcement, CW-2 laundered millions of dollars for CC-3 by check cashing.

    d. CW-2 provided the address of KADIROV's residence in Fresh Meadows, New York (the "Fresh Meadows Residence").

    e. CW-2 provided KADIROV's phone number, which ends in "-6661" (the "6661 Phone").

  44. On or about December 13, 2022, FBI agents conducting surveillance observed MUKHIDDIN KADIROV, the defendant, entering and exiting the Fresh Meadows Residence.

  45. Based on analysis of historical cell site data obtained pursuant to warrants for the 3523 Phone for the period between approximately May 2021 and May 2022 and the 6661 Phone between approximately December 2021 and December 2022, I have learned the following, in substance and in part:

    a. The 3523 Phone was regularly located within a several block radius in Fresh Meadows overnight, indicating the user of the 3523 Phone resided within that radius. The Fresh Meadows Residence is located within that radius.

    b. From in or about December 2021 through in or about May 2022, the 3523 and 6661 Phones were consistently co-located within the same radius in which the Fresh Meadows Residence is located.

    c. The cell-site location most consistently used by the 3523 and 6661 Phones is a cell-site consistent with the 3523 and 6661 Phones being located at the Fresh Meadows Residence.

    d. The 3523 and 6661 Phones were co-located in the same area in approximately 140 instances from in or about December 2021 through in or about May 2022.

46. Based on my review of travel records and bank records, I have learned that MUKHIDDIN KADIROV, the defendant, was in the United States at the time all funds were deposited into the Shell Companies' bank accounts.

47. I have reviewed a bank surveillance video for the Pharmacy-1 bank account from on or about April 10, 2021, which depicts an individual in a grey hooded sweatshirt wearing a COVID mask at an ATM. Based on my participation in physical surveillance of MUKHIDDIN KADIROV, the defendant, and my review of a DMV photo of KADIROV, I identify the person in the bank surveillance video to be KADIROV.

48. Based on my review of NYPD records, phone subscriber and toll records, and pen register data, I have learned that NERIK ILYAYEV and MUKHIDDIN KADIROV, the defendants, have had frequent phone contact:

    a. Based on my review of CMS records as well as flight booking records, I have learned that ILYAYEV has also used a cellphone number ending in "-0492" (the "0492 Phone"). Based on my review of NYPD records, I have learned that in or about 2016, ILYAYEV identified himself as "Eric Ilyayev" and provided the 0492 Phone as his phone number to NYPD officers. Moreover, I have learned that the listed user of the 0492 Phone in subscriber records is "N I", which are ILYAYEV's initials.

    b. Between in or about September 17, 2021 and December 27, 2021, the 6661 Phone was in contact with the 0492 Phone three times. Within that same time period, Pharmacy-1 deposited approximately 28 checks totaling approximately $1,199,000 into the Shell Companies.

    c. Between in or about January 2, 2023, and March 11, 2023, KADIROV, using the 6661 Phone, and ILYAYEV, using the 0492 Phone, exchanged approximately 74 messages and 65 calls using the message application WhatsApp.

WHEREFORE, I respectfully request that warrants be issued for the arrest of NERIK ILYAYEV and MUKHIDDIN KADIROV, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

                                      **.s Ali Amhaz-Strickland**  (By Court with Authorization)
                                      Ali D. Amhaz-Strickland
                                      Special Agent
                                      Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this  11th  day of April, 2023.

_[signature]_
_____
THE HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York

14